United States District Court
Southern District of Texas
**ENTERED**
March 14, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHARLES MORGAN LUSK, II (personally and derivatively on behalf of Cornerstone Onsite, LLC), SYLVASON, LLC (derivatively on behalf of Cornerstone Onsite, LLC), | § § § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-22-4183 |
| DANIEL GUGGENHEIM-NETTER, SOUTHERN SPEAR, INC., PAUL C. BENNETT, III, JOHN D. WHITE, SCOTT H. COLEMAN, CORNERSTONE ONSITE, LLC, and TIMOTHY NEWMAN, | § § § § § § § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

Charles Lusk founded Cornerstone Onsite, LLC to provide on-site dental services at educational and corporate campuses. Lusk alleges that unscrupulous investors, business partners, and company officers violated their duties to the company and to Lusk when they engaged in conduct that culminated in Lusk's termination in August 2022. Lusk and his wholly owned entity Sylvason, LLC sued in state court, asserting both derivative and direct claims. The plaintiffs amended the petition to add a claim for violations of the Computer Fraud and Abuse Act against Timothy Newman, Cornerstone's former CEO. The addition of the federal claim prompted removal to this court. (Docket Entry No. 1). The plaintiffs now move to sever the state-law claims and remand them to state court. (Docket Entry No. 7). Cornerstone has moved to compel arbitration of its dispute with Lusk. (Docket Entry No. 12). Based on the parties' briefing and the relevant law, the court denies the motion to sever and remand and grants the motion to compel arbitration. The reasons are as follows.

I.      **Background**

Charles Lusk is the sole member of Sylvason, LLC. (Docket Entry 1-1 ¶ 3).[1] Lusk owns 13.42%, and Sylvason 15.73%, of Cornerstone Onsite, LLC. (*Id.* ¶¶ 2–3). Cornerstone does business under the name Dent-Well. (*Id.* ¶ 2 n.2).

In 2010, Lusk came to believe that the general absence of onsite dental care in campus environments—both educational and corporate—represented a business opportunity. (*Id.* ¶ 18). While Lusk identified this opportunity and developed the business plan to implement it, he needed a dentist with industry experience. (*Id.* ¶ 20). Lusk hired Scott Coleman, whom he believed had the experience Lusk needed. (*Id.*). In return for Coleman's services as the "head of all clinical operations, staffing, quality, and treatment oversight," Lusk made Coleman an equal partner in Dent-Well. (*Id.*). Despite Coleman's equal interest, Lusk alleges that Coleman "did only the bare minimum necessary to satisfy his legal obligations as Dent-Well's licensed dentist." (*Id.* ¶ 38).

Lusk's business model proved initially successful at Dent-Well's first campus location, at the University of Houston, but Dent-Well required substantial investor capital to grow. (*Id.* ¶¶ 32, 39). Lusk reached out to his former instructor at Rice University's Jones School of Business, Dennis Murphree. (*Id.* ¶ 40). Murphree suggested that he and his partner, John White, invest in Dent-Well through Murphree Venture Partners, their venture capital firm. (*Id.* ¶ 42). Murphree Venture Partners closed on its first stage of their investment in Dent-Well in December 2012. (*Id.* ¶ 45).

---

[1] All paragraph references to Docket Entry No. 1-1 refer to the verified amended petition, filed on November 21, 2022. The amended petition begins on page 138 of Docket Entry No. 1-1, according to the pagination in the blue CM/ECF header. All page references to Docket Entry No. 1-1, including to the exhibits it contains, are to that pagination.

2

Around 2013, Dent-Well's success began outpacing Lusk's capacity to manage it, and Lusk suggested to Murphree and White that Dent-Well needed to hire an executive with past dental operations experience. (*Id.* ¶ 47). Murphree and White initially resisted, but subsequently "pressured Lusk to hire Murphree's son and other individuals in their personal networks." (*Id.*). These individuals did not have the abilities Lusk sought. (*Id.*). In 2014 and 2015, a lack of resources forced Dent-Well to abandon growth opportunities. (*Id.* ¶ 50). During this period, Lusk alleges that Murphree and White "insisted" on retaining Michael Fields as a consultant, despite Field's lack of experience in dental care or healthcare. (*Id.* ¶¶ 52–53). Around the time of Fields's hire, Lusk was able to secure only small additional investments from the father of a Dent-Well employee. (*Id.* ¶ 55). Eventually, Murphree helped secure additional capital from Daniel Guggenheim and Southern Spear, the North American subsidiary of Guggenheim's Swiss firm. (*Id.* ¶¶ 57–59).

Around February 2015, White asked to be appointed the Executive Chairman of the Cornerstone Board and to be paid $8,500 per month. (*Id.* ¶ 61). White also supported pay increases for Lusk and the other Board members. (*Id.*). White ultimately resigned the Chair position because of his alleged inability to "understand Dent-Well's business" or produce results. (*Id.* ¶ 63). At Lusk's renewed insistence, Dent-Well hired Timothy Newman, who had experience at a large dental services organization. (*Id.*). In August 2015, Newman became Chief Operations Officer, and White advocated for his eventual promotion to CEO. (*Id.* ¶ 64). When Newman was hired, both Newman and Lusk signed employment agreements with Dent-Well. (*Id.* ¶ 65). Lusk's contract memorialized his role as President and Founder of the company. (*Id.*).

Dent-Well continued to miss growth opportunities and still required additional capital. Lusk alleges that Murphree and White wanted to secure additional financing from Guggenheim

by issuing convertible bridge notes at high rates of interest, the terms of which were unfavorable to Lusk. (*Id.* ¶¶ 67–68). Lusk alleges that Murphree and White continued to promote to the board individuals with whom they had personal relationships or to whom they felt personally obligated, but who lacked relevant experience. (*Id.* ¶ 70).

Newman was promoted to CEO in November 2015, with responsibilities distinct from those of Lusk as President. (*Id.* ¶¶ 72–73). Newman was granted a board seat with his promotion. (*Id.* ¶ 74). Murphree and White insisted on only recording "light" board minutes, which took the form of "bullet points with no detail." (*Id.*).

Through Lusk's efforts, Dent-Well secured a large corporate client with a campus in Spring, Texas. (*Id.* ¶ 75). Guggenheim was to provide funding. As a last-minute condition, Guggenheim insisted that Dent-Well retain him as an advisor. (*Id.*). Because Dent-Well needed Guggenheim's funding, and because Murphree and White insisted, Guggenheim was provided additional consideration and ownership shares in the company. (*Id.* ¶ 77). Additionally, Southern Spear insisted on an agreement that eliminated rights of certain other shareholders and redefined the terms and conditions of their interests in Dent-Well. (*Id.* ¶ 78).

In August 2017, Hurricane Harvey destroyed Lusk's home and possessions. (*Id.* ¶ 80). To help his family rebuild, Lusk signed a $40,000 promissory note with Southern Spear and worked with Newman to obtain a loan from Dent-Well secured by Sylvason's ownership interests in Dent-Well. (*Id.*).

In late 2017, Lusk learned that Guggenheim had been directly compensating Murphree, primarily for Murphree's own interest in Dent-Well. (*Id.* ¶ 81). White and Fields helped facilitate the payments between Guggenheim and Murphree without disclosing them to other company managers. (*Id.*). The transactions between Guggenheim and Murphree occurred while

Guggenheim sought aggressive financing terms, presumably (the amended petition is not specific) in conjunction with the plan to open a Dent-Well on the Spring, Texas, corporate campus. (*Id.*). Murphree resigned from the board. Guggenheim and Southern Spear insisted that Paul Bennett, Southern Spear's representative, take Murphree's place. (*Id.* ¶ 82).

During 2018, White, Bennett, Guggenheim, and Southern Spear continued to insist that Southern Spear be given the first right to invest in Dent-Well. (*Id.* ¶ 84). With each round of investment came new terms and more control for Guggenheim and Southern Spear. (*Id.*). In August 2019, the board approved a $2.6 million investment from Southern Spear and awarded Lusk deferred bonus compensation, provided that Lusk stayed as President and Founder for three more years. (*Id.* ¶ 85).

In 2021, Lusk and Newman pressed for written compensation agreements, which White and others resisted. (*Id.* ¶ 90). Lusk's request for additional compensation came in part because he relocated from Houston to Nashville to further the company's growth outside the Houston area. (*Id.* ¶ 93). Newman and Lusk agreed to increase Lusk's compensation by $7,000 a month. Lusk's additional compensation was entered into the company's payroll system by Hunter Coleman, the son of Lusk's original partner, Scott Coleman. (*Id.* ¶ 96). Only Hunter Coleman and Newman had access to the payroll system. (*Id.*).

In November 2021, Southern Spear again sought expanded control over Dent-Well in return for additional funding. (*Id.* ¶ 99). Southern Spear demanded that, unless its loan was not repaid by the end of 2022, Southern Spear would take control of Dent-Well's financing and take senior lien positions on all Dent-Well assets. (*Id.* ¶ 101).

On April 26, 2022, Lusk and Dent-Well entered into an Award Agreement, which granted him 248,563 Class F shares with distributions to be made in accordance with the LLC agreement.

(*Id.* ¶ 102). The same day, the company executed a Fifth Amended LLC Agreement, (*id.*), and Lusk and Dent-Well executed an Incentive Bonus and Equity Grant Agreement. Under this agreement, Lusk would earn bonuses and Class D shares going forward. (*Id.*). Around this time, Newman confided to Lusk that White had approached him about being put on the company payroll "for unspecified duties." (*Id.* ¶ 104). The "duties" were not disclosed to the board. (*Id.*). Although the amended petition is unclear, it appears that Newman arranged for Dent-Well to compensate White. Lusk alleges that the terms of the arrangement were not "included . . . in the Company's reported financials." (*Id.*). Lusk confronted White, who stated that he neither had copies of his emails to Newman nor copies or memories of the terms of the agreements he allegedly signed. (*Id.* ¶ 105).

In May 2016, Bennett set up an "informal meeting" with Lusk away from Dent-Well's offices. (*Id.* ¶ 108). When Lusk arrived, White declared it a "special session" of the board, which was not in compliance with the notice provisions for board meetings contained in the LLC agreement. (*Id.*). Bennett had prepared a resolution terminating Newman, which Lusk and Coleman resisted. (*Id.*). Bennett insisted that the company retain outside consultants that he had identified. (*Id.* ¶ 109). Ultimately, the board adopted Bennett's resolutions to hire the consultants and to replace Newman with Lusk as CEO. (*Id.*). In subsequent discussions, Bennett stated his certainty that the board could find a reason to terminate Newman for cause to avoid paying any severance. (*Id.* ¶ 110). The amended petition does not allege whether Newman was terminated from Cornerstone or was merely removed as CEO. White and Bennett retained Skytale Group to conduct an operational and financial assessment of Dent-Well for $17,000 a month, plus expenses. (*Id.* ¶ 114).

6

Lusk again asked White to commit his compensation to writing. (*Id.* ¶ 111). On June 9, 2022, Lusk executed a new employment contract memorializing the increased compensation he had been granted the prior year. (*Id.* ¶ 112). The June 9, 2022, employment agreement stated that termination for cause could be based on Lusk's conduct before the execution of the agreement. (*Id.* ¶ 113).

In July 2022, Bennett and White pushed for David Wilson, Skytale's lead consultant, to become co-CEO with Lusk, despite Wilson's lack of experience with Dent-Well, much less a proven record of results. (*Id.* ¶ 116). Wilson was ultimately appointed "special advisor" to the board rather than co-CEO. (*Id.*). The board because increasingly secretive in its dealings with Lusk. (*Id.* ¶ 117). Lusk complained of Skytale's lack of engagement, its costs, and its unilateral hiring of an accounting firm at Dent-Well's expense. (*Id.*). In late July, Lusk circulated a memorandum relaying his concerns to the board. (*Id.* ¶ 120).

On August 3, 2022, Dent-Well terminated Lusk for cause, stating as the reason that Lusk took compensation increases without the board's knowledge. (*Id.* ¶ 122). Lusk was not notified of any vote before his termination. (*Id.*). Lusk was not terminated in his capacity as President, and he alleges that he remains President of Dent-Well. (*Id.* ¶ 125). Lusk alleges that his termination was a pretext to further the control Guggenheim and Southern Spear had over the company and to further their oppression of other shareholders. (*Id.* ¶ 126).

After Lusk sued in state court in November 2022, Lusk asked that Dent-Well transfer to the company personal guaranties he had signed for Dent-Well's obligations, in accordance with the termination provisions of his employment contract. The transfer of the guaranties has allegedly not occurred. (*Id.* ¶¶ 136–137).

7

Lusk had also personally registered the company's web domain and had maintained the company website. (*Id.* ¶ 145). Lusk alleges that he discovered that Newman had attempted to hack into Lusk's account on at least two occasions. (*Id.*). Lusk also alleges that Newman is responsible for someone attempting to access Lusk's personal Facebook account in order to remove Lusk from Dent-Well's Facebook pages. (*Id.* ¶ 146). Lusk amended his petition to add a Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*, claim against Newman for these actions. The claim against Newman is the only federal claim.

II.  **The Legal Standards**

   A.  **The Motion to Sever and Remand**

Federal Rule of Civil Procedure 21 states, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." FED. R. CIV. P. 21. The plaintiffs argue that the court should sever and remand their state-law claims because it lacks or should decline to exercise supplemental jurisdiction over those claims. The supplemental jurisdiction statute, 28 U.S.C. § 1367, provides:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). In *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966), the Supreme Court stated the rule, as follows:

> The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole.

*Id.* at 725. Two conditions must be met: the claims must share a "common nucleus of operative fact," and the plaintiff would "ordinarily be expected to try them all in one judicial proceeding." These conditions are often treated as redundant. *See* CHARLES ALAN WRIGHT & ARTHUR MILLER, 13D FEDERAL PRACTICE AND PROCEDURE § 3567.1 (3d ed.) ("And, frankly, the two factors do seem redundant, because if two claims are factually related, one normally would expect to try them together; the factual relatedness would make joint trial of both claims convenient.").

Section 1367 provides exceptions to its grant of supplemental jurisdiction:

The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

    (1) the claim raises a novel or complex issue of State law,

    (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

    (3) the district court has dismissed all claims over which it has original jurisdiction, or

    (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). In addition to these statutory factors, the court should also "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity," when deciding whether to maintain supplemental jurisdiction over state-law claims. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Both sets of factors are considered together, *Enochs v. Lampasas County*, 641 F.3d 155, 159 (5th Cir. 2011), and no single factor is dispositive. *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 587 (5th Cir. 1992).

### B. The Motion to Compel Arbitration

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, permits a party to move to compel arbitration when an opposing party refuses to arbitrate issues covered by a valid arbitration

agreement. *Am. Bankers Ins. Co. of Fla. v. Inman*, 436 F.3d 490, 493 (5th Cir. 2006) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)); 9 U.S.C. §§ 3, 4.

To determine whether a dispute is arbitrable under the FAA, the court must determine: "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute . . . falls within the scope of that arbitration agreement. *Gross v. GGNSC Southaven, LLC*, 817 F.3d 169, 176 (5th Cir. 2016) (quoting *Tittle v. Enron Corp.*, 463 F.3d 410, 418–19 (5th Cir. 2006)); *Gezu v. Charter Commc'ns*, 17 F.4th 547 (5th Cir. 2021). Federal policy strongly favors enforcing contractual arbitration agreements if the contract exists under state law and the disputes are within the scope of the arbitration clause. *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 217 (1983); *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

Unless the parties clearly and unmistakably provide otherwise, the court, not the arbitrator, decides whether the parties agreed to arbitrate a particular dispute. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). Incorporating of arbitration rules that vest the arbitrator with the power to determine arbitrability is considered clear and unmistakable evidence of party intent. *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 537 (5th Cir. 2019) ("One way parties can provide such clear and unmistakable evidence of their intent to delegate these issues is by expressly incorporating rules empowering the arbitrator to decide substantive arbitrability." (alterations and internal quotation marks omitted)).

**III.   Analysis**

    **A. The Plaintiffs' Motion to Sever and Remand**

The plaintiffs argue that the court lacks, or should decline to exercise, supplemental jurisdiction over their state-law claims. They do not dispute that the Computer Fraud and Abuse Act claim is within the court's original subject-matter jurisdiction.

The plaintiffs emphasize that § 1367(a) requires that state-law causes of action be "so related" to claims within the court's original jurisdiction for the court to exercise supplemental jurisdiction over them. (Docket Entry No. 7 at 4). The plaintiffs note that the claim under the Computer Fraud and Abuse Act is based on actions taken after those alleged in the original petition. (*Id.* at 2). The plaintiffs argue that this timeline demonstrates that the claims do not arise out of a common nucleus of operative fact and do not form part of the same case or controversy. (*Id.* at 5). The plaintiffs note that Newman is not a named defendant to the derivative action or to the breach-of-contract, tortious interference, civil conspiracy, or conversion claims. (*Id.*).

Even if supplemental jurisdiction is proper, the plaintiffs argue the court should decline to exercise it based on the first two factors listed in § 1367(c). The plaintiffs argue that the derivative claims raise complex issues of state law not yet squarely addressed by the Texas Supreme Court, including what duties a controlling shareholder—who is not also a board member—owes the business and its other shareholders. (Docket Entry No. 14 at 2). The plaintiffs argue that the state-law claims are predominant, both in their number and centrality to the action. (*Id.* at 2–3; Docket Entry No. 7 at 7–8).

The plaintiffs also argue that common-law considerations of judicial economy, convenience, fairness, and comity favor severance and remand of the state-law claims. The plaintiffs note that the court has not yet invested significant work in the action. (Docket Entry No. 7 at 8). The plaintiffs argue the complexity of the state-law claims would result in "[n]eedless decisions of state law." (*Id.* (quoting *Gibbs*, 383 U.S. at 726)). Finally, the plaintiffs argue that, in light of the complexity of the state-law claims and the "significant amount of Texas state jurisprudence that bears on those issues, the state-law claims are best left to the state court's determination." (*Id.* at 8–9).

11

In his opposition to the motion, Newman argues that the plaintiffs' Computer Fraud and Abuse Act claim directly relates to Lusk's claims challenging his termination and the defendants' breaches of their duties to Dent-Well. (Docket Entry No. 13 at 3). For example, Newman notes that the accounts and webpages to which he allegedly sought access are Dent-Well company accounts and webpages. (*Id.*). Newman argues that the resolution of the claims against him turns, at least in part, on the validity of claims against the other defendants. (*Id.* at 3–4). Because all of the plaintiffs' claims arise from Lusk's relationship with, and employment by, Dent-Well, the claims share a common nucleus of operative fact. (*Id.* at 6).

Newman also argues that the discretionary factors of § 1367(c), in addition to the common-law factors, favor the exercise of supplemental jurisdiction. Newman notes that the plaintiffs' claims all involve straightforward applications of existing state law. (*Id.* at 7–8). Newman responds that the state-law claims do not predominate because they involve "substantially the same facts and evidence." (*Id.* at 8 (quoting reference omitted)). The third statutory factor is not relevant because the federal claim has not been dismissed. (*Id.* at 9). Newman argues that, because there are no compelling reasons to decline jurisdiction, the final statutory factor favors exercising supplemental jurisdiction. (*Id.*). Newman also argues that common-law considerations of judicial economy and fairness favor jurisdiction, because, if the court to declined jurisdiction, Newman would be subject to discovery in two competing actions, and the parallel actions might result in inconsistent judgments. (*Id.* at 9–10).

The court finds that the exercise of supplemental jurisdiction is appropriate. The plaintiffs have themselves attempted to join the claim against Newman with the claims against the other defendants. The claim against Newman is plainly related to the claims brought against the other defendants: Newman plays an important role in the events alleged in the amended petition that

may, if proven, establish the liability of other defendants. Both the plaintiffs and the other defendants will presumably seek to depose Newman in discovery regarding the state-law claims. Both parties may plausibly seek other discovery from Newman. Newman's allegedly unlawful actions directly relate to the alleged wrongdoings of the other defendants that culminated in Lusk's ouster from Cornerstone. Whether Newman improperly sought to access the Dent-Well website domain may turn on the validity of Lusk's termination, making resolution of that claim necessary even if the claim against Newman was severed. Two courts resolving that same issue might lead to inconsistent judgments.

Finally, the alleged wrongful acts of Newman following Lusk's termination overlap with those acts alleged against the other defendants. The plaintiffs allege conversion against Guggenheim, Southern Spear, Bennett, White and Coleman. The plaintiffs allege these defendants "demanded that Lusk turn over property to the Company, *such as website registrations*, all of which are registered to Lusk." (Docket Entry No. 1-1 ¶ 215 (emphasis added)). The plaintiffs' Computer Fraud and Abuse Act claim, which concerns Newman's alleged attempts to gain control over Dent-Well's online presence, is clearly factually related to the conversion claim.

That the court has the power to hear the state-law claims does not mean that it must or should. But neither the statutory nor the common-law factors support severance and remand. Considering the first § 1367(c) factor, the court agrees with Newman that the plaintiffs' claims do not raise novel or complex issues of state law. The plaintiffs argue that Texas courts have not "squarely addressed" the facts alleged in their claims against Guggenheim, but the plaintiffs admit that there is "some guidance" from the Texas Supreme Court. (Docket Entry No. 14 at 2 (citing *Ritchie v. Rupe*, 443 S.W.3d 856 (Tex. 2014)). The plaintiffs note that there is a "significant amount of Texas state jurisprudence" with which this court may resolve the state claims. Courts

13

regularly reject the notion that state-law claims against corporate fiduciaries are novel or complex.[2] This is not a case in which the Texas courts have had no opportunity to interpret a particular statute, *see, e.g.*, *Enochs*, 641 F.3d at 159 (5th Cir. 2011), or in which the court must confront a novel question of state sovereign immunity, *id.*, or in which a state's highest court has not resolved a split among appellate courts. *See, e.g.*, *Knatt v. Hosp. Serv. Dist. No. 1 of E. Baton Rouge Par.*, 373 F. App'x 438, 442 (5th Cir. 2010).

The second § 1376(c) factor supports remand. All 13 claims but one are based on state law. The original petition did not raise any federal question. Although the plaintiffs' claims relate to Lusk's employment relationship with Dent-Well, the state-law claims will likely require more extensive discovery and other party and court resources than the federal claim alone. The third factor supports the court's exercise of jurisdiction, because the federal claim is still viable. The plaintiffs have not identified special considerations supporting remand under the fourth and final § 1376(c) factor.

With respect to the common-law factors, Newman's potential involvement in two separate actions support supplemental jurisdiction based on judicial economy and fairness. Convenience is neutral because both courts lie in Harris County. Courts that have found comity favored remand have generally done so when the federal claim has previously been dismissed. *See Inge v. Walker*,

---

[2] *See, e.g.*, *Wolinsky v. Oak Tree Imaging, LP*, 362 B.R. 770, 779 (S.D. Tex. 2007) (holding that "state-law claims of fraud, breach of fiduciary duty, and self-dealing cannot be said to raise 'novel or complex issue[s] of State law.'"); *In re Avado Brands, Inc.*, No. 04-31555-RCM-11, 2006 WL 8437389, at *10 (Bankr. N.D. Tex. Apr. 21, 2006) (breach of fiduciary duty claim not novel or complex), *report and recommendation adopted*, No. 04-31555, 2006 WL 8436979 (N.D. Tex. July 3, 2006); *see also Aetna Life Ins. Co. v. Guerrera*, 300 F. Supp. 3d 367, 387 (D. Conn. 2018) (finding that, among others, breach-of-contract and fiduciary-duty claims did not raise complex or novel issues of state law), *aff'd sub nom. Aetna Life Ins. Co. v. Big Y Foods, Inc.*, 52 F.4th 66 (2d Cir. 2022).

No. 3:16-cv-0042-B, 2016 WL 4920288, at *9 (N.D. Tex. Sept. 15, 2016) (citing *Parker & Parsley*, 972 F.2d at 588–89, and *Enochs*, 641 F.3d at 158, 160).  The federal claim is not dismissed.

The court denies the plaintiffs' motion to sever and remand.

### B.  Cornerstone's Motion to Compel Arbitration

Cornerstone argues that the court must compel or dismiss this action in favor of arbitration, because Lusk's contract of employment with Cornerstone contains a mandatory arbitration clause. In opposition, the plaintiffs argue that—assuming a favorable ruling on their motion to sever and remand—the court lacks jurisdiction over this action and therefore over Cornerstone's motion. The court is satisfied of its jurisdiction and finds this argument inapplicable.

The plaintiffs also argue that other relevant agreements contain venue provisions mandating that any dispute be brought in the courts of Texas.  The parties identify the following four contracts and jurisdictional clauses as relevant to Cornerstone's motion to compel:

*First,* the Award Agreement, signed by Lusk and White, as Chairman of Cornerstone, states:

> **Governing Law/Choice of Forum**.  This Agreement shall be construed and enforced in accordance with the laws of the State of Texas notwithstanding any state's choice-of-law rules to the contrary.  The parties hereto agree that any legal action relating to this Agreement shall be commenced and maintained exclusively before any court of competent jurisdiction sitting in Texas and the parties hereby submit to the sole and exclusive jurisdiction of such courts and waive any right to challenge or otherwise object to personal jurisdiction or venue in any action commenced or maintained in such courts.

(Docket Entry No. 1-1, Ex. C (Cornerstone Onsight LLC Award Agreement, dated as of April 26, 2022) at 210 § 17).

*Second*, the LLC Agreement, signed by Cornerstone's managers and members, states:

> Submission to Jurisdiction.  The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in any federal or state court

15

> located in Harris County, Texas.  Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.  Service of process, summons, notice or other document by registered mail to the address set forth in Section 12.2 shall be effective service of process for any suit, action or other proceeding brought in any such court.

(*Id.*, Ex. D (Fifth Amended and Restated Company Agreement of Cornerstone Onsite, LLC, dated as of April 26, 2022) at 257 § 12.8).

*Third*, the Incentive Agreement, signed by Lusk and White, as Chairman of Cornerstone, states:

> **GOVERNING LAW/CHOICE OF FORUM**. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas notwithstanding any state's choice-of-law rules to the contrary. The parties hereto agree that any legal action relating to this Agreement shall be commenced and maintained exclusively before any court of competent jurisdiction sitting in Texas and the parties hereby submit to the sole and exclusive jurisdiction of such courts and waive any right to challenge or otherwise object to personal jurisdiction or venue in any action commenced or maintained in such courts.

(*Id.*, Ex. E (Incentive Bonus and Equity Grant Agreement, dated as of April 26, 2022) at 278 § 11.)

*Fourth* and finally, the June 9, 2022 Employment Agreement, signed by Lusk and White, as Chairman of Cornerstone, states:

> Agreement to Arbitrate:
>
> Any controversy, dispute or disagreement arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration, which shall be conducted in Harris County, Texas in accordance with the American Health Lawyers Association Alternative Dispute Resolution Service Rules of Procedure for Arbitration, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

(*Id.*, Ex. F (Cornerstone Onsite, LLC Employment Contract, dated as of June 9, 2022) at 285 § 19).

The plaintiffs argue that the multiplicity of jurisdictional clauses contained in these agreements, which all appear at first glance relevant to this lawsuit, means that "it cannot be

16

plausibly maintained that there is an arbitration provision among the parties requiring arbitration of all Plaintiffs' claims." (Docket Entry No. 15 at 6). The plaintiffs argue that granting Cornerstone's motion would "violate . . . the public policy underlying arbitration," (*id.*), because "a court cannot compel a party to arbitrate unless the court determines that the parties agreed to arbitrate the dispute in question." (*Id.* (quoting *Kellogg Brown & Root Servs., Inc. v. Altanmia Com. Mktg. Co. W.L.L.*, No. H-07-2684, 2007 WL 4190795, at *15 (S.D. Tex. Nov. 21, 2007)).

Cornerstone responds that the Fifth Circuit's presumption in favor of arbitration, combined with the centrality of Lusk's employment dispute to his claims, brings all the plaintiffs' claims within the scope of the Employment Agreement's broad arbitration clause. (Docket Entry No. 16 at 2–3). Cornerstone argues that "courts applying Texas law frequently construe a forum selection clause that does not explicitly exclude arbitration as harmonizing with arbitration provisions." (*Id.* at 3).

Resolution of Cornerstone's motion does not require that the court perform the harmonization Cornerstone proposes. Under the Fifth Circuit's holding in *Halliburton*, the court need not determine which of the plaintiffs' claims are arbitrable, because the arbitration clause in the Employment Agreement incorporated the American Health Law Association's procedural rules for arbitration. The Employment Agreement refers to the "American Health Lawyers Association," which was the name of the "American Health Law Association" prior to January 2020.[3] Both the Association's employment and commercial rules grant the arbitrator with the power to determine arbitrability. AM. HEALTH LAW ASS'N, RULES OF PROCEDURE OF EMPLOYMENT ARBITRATION § 3.1 (effective Nov. 1, 2021) ("After receiving appropriate evidence

---

[3] Am. Health Law Ass'n, *About AHLA* (last visited March 3, 2023), *available at* https://www.americanhealthlaw.org/about-ahla.

17

and argument, the arbitrator, once appointed, shall have the power to determine his or her jurisdiction and any issues of arbitrability."); AM. HEALTH LAW ASS'N, RULES OF PROCEDURE OF COMMERCIAL ARBITRATION § 3.1 (effective Nov. 1, 2021) (same).[4] The parties' incorporation of these rules within the employment agreement shows their intent to grant the arbitrator, not this court, with the power to determine arbitrability. *Halliburton*, 921 F.3d at 537. Even were it plain to the court that some of the plaintiffs' claims were not arbitrable, the parties' incorporation of these rules means that the arbitrator must decide all questions of arbitrability. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (there is no exception to a contract's grant of power to the arbitrator to determine arbitrability, even if the court believes that "the argument for arbitration is wholly groundless").

      The parties have agreed to submit disputes regarding the arbitrability of disputes related to the employment agreement to arbitration. If the arbitrator concludes that some or all the plaintiffs' claims are not arbitrable, the parties may return to this court to determine how to handle any nonarbitrable claim or claims. The law, and the parties' agreements, leads the court to grant the motion to compel arbitration.

---

[4] *See* https://www.americanhealthlaw.org/dispute-resolution-services/arbitration/rules-of-procedure-for-arbitration.

## IV.     Conclusion

The motion to sever and remand, (Docket Entry No. 7), is denied. The motion to compel arbitration, (Docket Entry No. 12), is granted. This case is stayed and administratively closed pending the resolution of the arbitration.

SIGNED on March 14, 2023, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge